(Docket Entry No. 25)

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

GREGORY DEPIANO,

        Plaintiff,

      v.                   Civil No. 02-5441 (RBK)

ATLANTIC COUNTY et al.,

        Defendants.


## O P I N I O N

**KUGLER**, United States District Judge:

      Before the Court is a motion for summary judgment by Defendants Gary Merline and Atlantic County.  For the reasons to follow, the motion will be granted in part and denied in part.  In specific, the Court will deny all of the motion except for the parts directed at DePiano's claim for disability discrimination and DePiano's claim for disparate treatment based on gender discrimination.  Both claims were brought pursuant to the New Jersey Law Against Discrimination.  Thus, DePiano's only remaining claim under that statute will be his harassment claim.

      DePiano was seeking compensatory and punitive damages and reinstatement to the position he held before being demoted.  On December 3, 2004, the Court granted summary judgment on all of DePiano's claims based on the doctrine of

judicial estoppel. But on January 31, 2005, the Court amended that ruling and restored

DePiano's claims for reinstatement under the New Jersey Law Against Discrimination,

N.J. Stat. Ann. § 10:5-4 ("LAD") and 42 U.S.C. § 1983.  Whether DePiano is entitled to

reinstatement under either statute remains an open question.[1]


## I. INTRODUCTION

Gregory DePiano commenced this action on November 6, 2002 against the

County of Atlantic and Gary Merline, Warden of the Atlantic County Justice Facility

("ACJF").  In his Amended Complaint, DePiano sets forth four counts.  In the first three

counts, DePiano alleges that the Defendants violated his rights to privacy under federal

law, common law, and New Jersey law.  In his Fourth Count, DePiano alleges that the

Defendants violated the New Jersey Law Against Discrimination ("LAD") when they

discriminated against him because of his gambling addiction and his actual or perceived

sexual orientation.  DePiano has worked as a corrections officer at the ACJF since August

of 1987.  He was promoted to sergeant in 1997 and served in that position until he was

demoted back down to corrections officer in January 2003.  DePiano currently holds the

---

[1]  Defendants arguments were originally directed at all of DePiano's claims, without
specifically focusing on the claims for reinstatement.  In granting summary judgment, the Court,
because it focused solely on judicial estoppel, did not address Defendants' arguments regarding
the elements of DePiano's claims.  At the request of the parties, the Court will do so now.  The
Court will address all claims under the LAD and 42 U.S.C. § 1983 because those two statutes
provide for reinstatement in certain situations.  Whether reinstatement is ultimately an
appropriate remedy will need to be decided at trial.

rank of corrections officer.  Gary Merline has been warden of the ACJF since January

2000.  Prior to becoming warden, Merline worked in the Internal Affairs Department of

the ACJF.

      A.  <u>Claims for Excessive/Unwarranted Disciplinary Actions</u>

      On June 5, 2001, DePiano was served with disciplinary charges by Atlantic

County.  The charges were for various infractions of internal rules and regulations for

gambling while on duty.  In exchange for a five-day suspension in lieu of his demotion,

DePiano and Atlantic County executed a Settlement Agreement and General Release

Agreement that was ratified by Atlantic County on November 22, 2001.  The avowed

purpose of the agreement was

> to resolve the disposition of the charges in a summary fashion without the
> necessity for a hearing and in order to avoid the uncertainty, expense and
> burden of litigation, and of any and all other matters and proceedings that
> might arise between Employee and Employer as a result of the aforesaid
> charges.

Defs. Exhibit D at ¶ 1.

The Agreement was drafted by DePiano's attorney and provides, in part, as follows:

> Employee releases and forever discharges for himself, his heirs, executors, and
> administrators, the Employer and any employees and agents of the Employer,
> of and from all demands, complaints, causes of action, claims and charges
> whatsoever as a result of the filing of these charges . . .

> Employee understands that the above paragraph includes a waiver of all
> demands, complaints, causes of action, claims and charges against the
> Employer . . . whether known or unknown, asserted or unasserted, suspected
> or unsuspected, which Employee may have as a result of any act that has

3

occurred arising out of the filing of the attached Preliminary Notice of Discipline.

Defs. Exhibit D at ¶¶ 5 & 6

Part of DePiano's claim under the LAD is that when he committed disciplinary infractions, Merline imposed unduly harsh penalties because DePiano is a cross-dresser. Since January 2000, when Merline became Warden, DePiano has been issued a total of thirty-three suspension days, four reprimands, and six counselings. In the twelve years prior, DePiano was issued a total of twenty suspension days, nine reprimands, and six counselings. Thus, under Merline's watch, DePiano has been disciplined at a greater rate. Merline, who is ultimately responsible for imposing discipline, explained that he imposes discipline on a progressive scale.

For his part, DePiano does not dispute that he has committed any of the infractions for which he was disciplined. That is, he is not claiming Merline has falsified charges against him. DePiano's contention is that he has received overly harsh discipline from Merline, culminating in his demotion. Though the Court will not recount his entire disciplinary history, the infractions committed by DePiano leading up to his demotion are relevant to his LAD claim and are, therefore, worth detailing.

Three separate infractions led to DePiano's demotion. First, on January 28, 2002, DePiano received a notice of disciplinary action arising out of the improper transfer of an inmate. In this incident, DePiano caused an inmate to spend three extra days in a disciplinary cell. Second, on January 29, 2002, DePiano received another notice of

4

disciplinary action arising out of the improper release of an inmate.  This time, DePiano, when transferring the inmate to the custody of other authorities, failed to provide those authorities with all of the inmate's paperwork.  Had he followed the appropriate procedures, it would have been discovered that the inmate was not eligible for bail due to charges pending in another state.  As it was, the inmate was released once he posted bail. Finally, on February 19, 2002, DePiano received a notice of disciplinary action based on DePiano's questioning of an inmate after the inmate had invoked his right to remain silent.  For the first two disciplinary charges, Merline recommended a six and ten day suspensions, respectively.  For the final charge, Merline requested DePiano be terminated.

A hearing regarding all three charges was held on November 15, 2002 before hearing officer James Walsh.  After a disagreement regarding the conduct of the hearing, DePiano, who was accompanied by counsel, left and chose not to participate. Walsh concluded that the modified recommendation of demotion from the rank of sergeant to the rank of corrections officer was warranted based on DePiano's having admitted to the charges against him as well as DePiano's prior disciplinary history.

B.  Claims for Invasion of Privacy

DePiano's claim for invasion of privacy is based on his allegation that Merline distributed photographs of DePiano dressed in women's clothing.  Merline first saw the photographs after Lisa Hurley was arrested some time in 1992.  Hurley and

DePiano were acquaintances during the mid-1980's.  Hurley deposed that she had taken the photographs of DePiano after a night of drinking and that she had them in her purse when she was arrested and processed in 1992.  At that time, the photographs remained with Atlantic County and were placed in DePiano's Internal Affairs file in 1994.  Though DePiano steadfastly maintains he was drugged and photographed without his permission, the events depicted in the photographs are consistent with DePiano's habits.  That is, DePiano regularly dressed up in women's clothing, but only in private; and once in public at a Halloween party in Atlantic City.  Apparently, dressing up in women's clothing is, or at some point was, part of his sexual life.

As it turns out, the photographs did not always stay in DePiano's Internal Affairs file.  Though he admits he had no reason for doing so, Merline showed the photographs to several other corrections employees, including Fred Frederiksen, Phil Rice, and Brian Deveney.[2]  Rumors about DePiano being a cross dresser became widespread over the years: officers and inmates alike would taunt DePiano about his being a cross dresser, and it seemed that almost every officer knew about the photographs.

How the photographs and their contents went from being part of DePiano's Internal Affairs file to becoming the worst-kept secret in the ACJF, is not clear.  Defendants point out that DePiano has not kept it a complete secret himself.  Specifically,

---

[2]  Deveney does not recall who, exactly, showed him the photographs, but is sure that Merline was in the room at the time.

they point to the fact that DePiano dressed as a woman when he attended a Halloween party with former ACJF employee Pam Davis.  Further, Defendants point out that DePiano partook in his cross-dressing habit with several past girlfriends; and it is not known whether any past girlfriends divulged their experiences with DePiano.  Yet another explanation–one Defendants are less keen on offering–is that the indiscriminate manner in which Merline showed the pictures to other employees may have led to the photographs' common place in ACJF lore.  The Court will expand on these possibilities in the Discussion below.

## II.  SUMMARY JUDGMENT STANDARD

Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  In deciding whether there is a disputed issue of material fact, a court must view the facts and all reasonable inferences in a light most favorable to the nonmoving party.  Id. at 250; Anderson v. Consol. Rail Corp., 297 F.3d 242, 247 (3d Cir. 2002).

The moving party always "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the 'pleadings, depositions, answers to interrogatories, and admissions on file, together with the

affidavits, if any,' which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  Where the nonmoving party bears the burden of persuasion at trial, however, "the burden on the moving party may be discharged by 'showing'–that is, pointing out to the district court–that there is an absence of evidence to support the nonmoving party's case." Id. at 325.  The non-moving party "may not rest upon the mere allegations or denials of" its pleadings and must present more than just "bare assertions, conclusory allegations or suspicions" to establish the existence of a genuine issue of material of fact.  Fed. R. Civ. P. 56(e); Jalil v. Avdel Corp., 873 F.2d 701, 707 (3d Cir. 1989) (citation omitted).  "A party's failure to make a showing that is 'sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial' mandates the entry of summary judgment." Watson v. Eastman Kodak Co., 235 F.3d 851, 857 (3d Cir. 2000) (quoting Celotex, 477 U.S. at 322).

## III. DISCUSSION

In their Motion for Summary Judgment, Defendants argue that they are entitled to summary judgment in their favor for several reasons.  Defendants separate their arguments into ten points.  Two of their arguments relate to monetary damages, which are now irrelevant.  The remaining arguments can be condensed into four basic arguments.  First, Defendants argue that DePiano waived his rights to assert all claims he

8

is pursuing in this litigation.  Second, Defendants argue that DePiano's claim for invasion of privacy under section 1983 is time-barred or, alternatively, that DePiano's right to privacy was not violated.  Third, they argue that DePiano cannot establish any of his LAD claims.  Finally, Defendants argue that DePiano failed to make use of the administrative remedies available to him for claims of discrimination, and therefore his claim against Atlantic County is barred.  The Court will address each argument in turn.

A.  Settlement and Release Agreement

 The scope of the settlement agreement, as evidenced by its language, is limited to claims arising out of the disciplinary action for the gambling charges and thus does not bar DePiano's remaining claims.

The language of a release agreement will determine its scope.  When determining the scope of a release agreement, "'courts [should] indulge every reasonable presumption against waiver' and [should] 'not presume acquiescence in the loss of fundamental rights.'"  Johnson v. Zerbst, 304 U.S. 458, 464 (1938) (quoting Aetna Insurance Co. v. Kennedy, 301 U.S. 389, 393 (1937); Ohio Bell Telephone Co. v Public Utilities Commission, 301 U.S. 292, 307 (1937)); Erie Telecommunications, Inc. v. City of Erie, 853 F.2d 1084, 1096 (3d Cir. 1988).  Courts must also limit general words in a release by the particular recitals that appear with the general words.  Texas & Pacific Railway Co. v. Dashiell, 198 U.S. 521, 527-28 (1905).

9

The language of the settlement agreement clearly limits the universe of claims waived by DePiano to those arising out of the gambling charges.  In the settlement agreement, DePiano waived several types of claims, including the types of claims that he is asserting now.  But the language of the settlement agreement limits the subject matter of his waiver to those claims "arising out of the filing of the attached Preliminary Notice of Discipline."  Therefore, by the language of the settlement agreement, DePiano waived only those claims related to the gambling charges.  Further, and although DePiano has continued to complain that all disciplinary penalties imposed by Merline were excessive, his claims under the LAD are limited to his demotion for the three disciplinary infractions that occurred after the settlement agreement was executed.

As for DePiano's section 1983 claims, they are based on events that had been ongoing since sometime in the mid-1990's but were not waived.  Whereas there are two reasons the LAD claims have not been waived–they are not based on the gambling charges and are based on events that occurred after the settlement agreement–there is only one reason DePiano did not waive his section 1983 claim:  it does not arise out of the gambling charges.  For these reasons, Defendants' motion for summary judgment will be denied.

B.  LAD Claims

DePiano alleges that Defendants violated the LAD by subjecting him to

10

excessive disciplinary punishment because of his gambling addiction, his cross-dressing, or both.  Defendants argue they are entitled to summary judgment on these LAD claims because (1) compulsive gambling is not a disability or handicap, (2) no one perceived DePiano as a homosexual, and (3) DePiano cannot show that he was harassed or discriminated against.

1. *Compulsive Gambling*

Defendants are entitled to summary judgment on DePiano's LAD claim based on his status as a compulsive gambler.  New Jersey's LAD bars discrimination against people because of disabilities, both physical and non-physical.  A non-physical disability is defined as "any mental, psychological, or developmental disability resulting from an anatomical, psychological, physiological, or neurological condition which prevents the normal exercise of any bodily or mental functions or is demonstrable, medically or psychologically, by accepted clinical or laboratory diagnostic techniques." N. J. Stat. Ann. § 10:5-5(q); Viscik v. Fowler Equipment Co., 800 A.2d 826, 834 (N.J. 2002).  Compulsive gambling was recognized as a mental illness in Matter of Goldberg, 536 A.2d 224, 228 (N.J. 1988).  There the court acknowledged that compulsive gambling has been classified as a mental illness by the American Psychiatric Association ("APA") in the  DSM-III.  Id.  The mere fact that a disorder appears in the APA's diagnostic manual does not mean, however, that it meets the legal standard for a disability under the

LAD.  A.B.C. v. XYZ Corp., 660 A.2d 1199, 1205-06 (N.J. Super. App Div. 1995)

(Petrella, J., concurring); see also Venezia v. U.S., 884 F.Supp. 919, 925 (D.N.J. 1995).

 The part of the LAD that prohibits discrimination on the basis of a disability

is generally interpreted in a manner consistent with the ADA. See Clowes v. Terminix

Int'l, 538 A.2d 794, 805 (N.J. 1988) (applying Title VII burden-shifting framework to a

claim under the LAD of discrimination on the basis of a handicap); Boshard v.

Hackensack Univ. Med. Ctr., 783 A.2d 731, 737-38 (N.J. Super. App. Div. 2001) ("We

look to the ADA for guidance because that course has been encouraged by the Supreme

Court of this State.") (citing Grigoletti v. Ortho Pharmaceutical Corp., 570 A.2d 903,

906-07 (N.J. 1990)).

 Rather than unreflectively adopting federal disability law, however, New

Jersey courts have taken a broader approach to determining whether one is handicapped

or, now, disabled.[3]  See Clowes, 538 A.2d at 804 ("The statutory definition of

'handicapped,' . . . is very broad in its scope."); Viscik v. Fowler Equip. Co., 800 A.2d

826, 835 (N.J. 2002).  A condition not recognized as a disability under federal law has

sometimes been deemed a handicap, or a disability, under the LAD.  See Failla v. City of

Passaic, 146 F.3d 149, 153-54 (3d Cir. 1998) (finding no inconsistency in jury verdict that

---

 [3]  The legislature added the term "disability" to § 10:5-4, thus adding it to the list of bases on which discrimination is illegal under that section, and the legislature also substituted the term "disabled" for "handicapped" and the term "disability" for "handicap" in § 10:5-4.1.  See Historical and Statutory Notes to §§ 10:5-4 and 10:5-4.1.  The changes do not appear to have any substantive significance.

found plaintiff was not "disabled" under the ADA but still "handicapped" under the

LAD); compare 42 U.S.C. § 12211(b)(1) (expressly excluding "transvestism,

transsexualism, pedophilia, exhibitionism, voyeurism, gender identity disorders not

resulting from physical impairments, [and] other sexual behavior disorders.") with

Enriquez v. West Jersey Health Sys., 777 A.2d 365, 376 (N.J. Super. App. Div. 2001)

(holding "gender dysphoria" related to transsexualism is a handicap under the LAD).  The

most important difference between the New Jersey statute and the federal statute is that

the LAD does not require that the plaintiff's ailment limit a substantial major life activity.

Failla, 146 F.3d at 155; Olson v. General Elec. Astrospace, 966 F. Supp. 312, 314-15

(D.N.J. 1997); Enriquez, 777 A.2d at 375.

        To establish the first element of a claim for unlawful discrimination based

on a disability, a plaintiff must "submit proof that he or she was [disabled]."  Enriquez,

777 A.2d at 376.  The appellate division in Enriquez, after concluding that gender

dysphoria was a disability under the LAD, went on to review whether the plaintiff had

submitted enough proof to establish that she in fact suffered from gender dysphoria.  Id.

at 376-77.  Review of that opinion shows that the inquiry on summary judgment is not a

casual one.  The court in Enriquez examined closely the type of treatment the plaintiff had

to undergo and the effects of that treatment.  Id. at 377 ("Solely from the circumstances of

plaintiff's course of treatment, we can infer sufficient impairment of plaintiff's emotional

and mental well being to constitute a disability under the LAD.").  Moving beyond the

plaintiff's course of treatment, the court noted that the LAD requires that the disability result from a condition that is demonstrable by accepted diagnostic techniques.  Id.  The record was silent on the techniques and results of diagnoses regarding the plaintiff's gender dysphoria.  Id.  Because the law division judge had granted summary judgment on the basis of the conclusion that gender dysphoria was not a disability, the appellate division remanded with instructions that the plaintiff would have to "prove that she had gender dysphoria and that the disorder was diagnosed by 'accepted clinical or laboratory diagnostic techniques.'"  Id. (citing N.J. Stat. Ann. § 10:5-5(q)).

Ultimately, DePiano has not demonstrated that his compulsive gambling is a disability under the LAD.  He has not pointed to, and this Court has not found, a single case recognizing compulsive gambling as a disability under the LAD.  Assuming it is a disability, DePiano has not demonstrated that he actually suffers from compulsive gambling.  DePiano explains in his brief that he has produced medical records of his disability for Defendants, but he has not included those medical records as part of the record before the Court.  Therefore, aside from DePiano's own claims that he is a compulsive gambler, there is no proof before the Court on this issue.

Once Defendants pointed to a lack of evidence supporting DePiano's claim that he is disabled, it became DePiano's burden to come forward with some evidence that created a genuine issue of fact for trial on that issue.  See Celotex, 477 U.S. at 322.  He has failed to do so.  Therefore, the Court will enter summary judgment in favor of

14

Defendants on DePiano's claim of disability discrimination under the LAD.

2. *Discrimination on the Basis of Sex or Sexual Orientation*

Defendants argue that DePiano cannot use perceived sexual orientation as a basis for his LAD claims because he was not perceived as a homosexual.  DePiano argues that under the LAD's prohibition of discrimination on the basis of sex a plaintiff need not be perceived as homosexual.  Rather, DePiano argues, a plaintiff may bring an LAD claim for discrimination or harassment based on gender role stereotyping.

New Jersey Courts recognize a claim for discrimination based on gender stereotyping under the LAD.  Specifically, in Zalewski v. Overbrook Hospital, 692 A.2d 131 (N.J. Super. Law Div. 1996), the court ruled that individuals who are harassed because their behavior does not conform to stereotypical gender behavior have a cause of action under the LAD.  Id. at 135-36.  As the court explained, the LAD is meant to combat any type of harassing conduct that is motivated by another's sex, including one's failure to conform to accepted notions of gender appropriate behavior.  Id. at 136.  The Zalewski opinion digested the varied rulings on the topic, including rulings from federal courts interpreting Title VII, and concluded that the majority of courts have held that same-sex harassment is actionable under Title VII.  See id. at 133-34 (discussing cases).  The critical inquiry in those cases was whether the plaintiff was treated differently because he was a man.  See id.  As the court in Zalewski, admitted, however, the issue

15

before it was different in that Zalewski was claiming harassment not simply because he was a man, but rather because he did not conform to the common stereotype for male behavior; namely his co-workers "believed him to be a virgin and effeminate." Id. at 135. Nonetheless, the court ruled that the LAD prohibited discrimination–and thus harassment–based on one's failure to conform to a particular gender stereotype. Id.

Following up–and implicitly approving of–the Zaleswki case was the appellate division case of Enriquez v. West Jersey Health Sys., 777 A.2d 365 (N.J. Super. App. Div. 2001). In that case, the plaintiff, a transsexual, asserted a claim for gender discrimination: "[T]hat her 'sexual affectation and/or orientation and/or gender, real or as perceived by the defendants was and is a determining factor in connection with defendants ongoing discriminatory, retaliatory and harassing treatment of Plaintiff.'" Id. at 371. After surveying the cases on the topic, including Zalewski, the court held "that sex discrimination under the LAD includes gender discrimination so as to protect plaintiff from gender stereotyping and discrimination for transforming herself from a man to a woman." Id. at 373.

Turning to DePiano's claim, the Court cannot grant summary judgment on the basis of Defendants' argument that DePiano was not perceived or treated as a homosexual. This argument misses the point. As detailed above, the LAD prohibits discrimination, including harassing conduct, on the basis of gender stereotyping. From the record, one could conclude that Merline and his staff harbored negative perceptions of

16

DePiano as a male who did not conform to the male stereotype because he wore women's clothes.

The next question, which the Court will now address, is whether DePiano was discriminated against on the basis of these negative perceptions of his behavior. This analysis will branch into two separate discussions. First, the Court will address whether the record supports a finding that DePiano suffered harassment based on gender stereotyping in violation of the LAD. Then, the Court will address DePiano's claim that Defendants violated the LAD by imposing unduly and disparately harsh discipline because DePiano dressed in women's clothing. This second analysis will proceed under the McDonnell Douglas/Burdine burden shifting paradigm. In short, the Court concludes that Defendants are not entitled to summary judgment on DePiano's harassment claim, but are entitled to summary judgment on his disparate treatment claim.

### a. Harassment

Defendants argue that DePiano's claim for harassment must fail because the complained-of conduct was not sufficiently severe or pervasive to give rise to a cause of action under the LAD. The Court disagrees.

The standard for establishing a hostile work environment claim under the LAD was set forth by the New Jersey Supreme Court in Lehmann v. Toys 'R' Us, Inc., 626 A.2d 445 (N.J. 1993). The Lehman court held that to succeed with such a claim, a

plaintiff must establish four elements: "[T]he complained-of conduct (1) would not have occurred but for the employee's gender; and it was (2) severe or pervasive enough to make a (3) reasonable [person][4] believe that (4) the conditions of employment are altered and the working environment is hostile or abusive." Id. at 453.  Only the second element–severe or pervasive harassing conduct–is raised in Defendants' motion.  In analyzing this element of a harassment claim, the Court must consider only the severity or pervasiveness of the harassing conduct, and not its effects on the plaintiff or the work environment.  Id. at 455 (citing Ellison v. Brady, 924 F.2d 872, 878 (9th Cir. 1991)).  Furthermore, the court is to consider all the circumstances surrounding the alleged harassing conduct: isolated incidents of harassment that, individually, do not create a hostile work environment may nonetheless establish a hostile work environment when considered collectively.  Lehmann, 626 A.2d at 455.

The record in this case permits the conclusion that DePiano was subjected to severe and pervasive harassment because of his cross-dressing.  DePiano was taunted throughout the facility by numerous officers.  Furthermore, the inmates also knew of

---

[4]  The original text of the Lehman opinion uses the word "woman" in setting forth the four controlling elements of a hostile work environment claim.  The Court made it clear, however, that its ruling applied to all sorts of harassment.  Lehman, 626 A.2d at 454 ("[T]he standard we announce today applies to sexual harassment of women by men, men by women, men by men, and women by women. The LAD protects both men and women and bars both heterosexual and homosexual harassment. The only difference in the standard would be that a male plaintiff would have to allege conduct that a reasonable man would believe altered the conditions of his employment and created a working environment that was hostile to men.").

DePiano's cross-dressing and subjected him to their own taunts.  Though Defendants do not acknowledge that the taunts of prisoners may create a hostile working environment, there appears no more effective a way to engender horrible working conditions for a prison guard than to reveal one of his embarrassing secrets to the general population.  The cumulative effects of the frequent taunting endured by DePiano may have created a hostile work environment.  For that reason, the Court will deny Defendants' motion for summary judgment on this claim.

### b.  Disparate Disciplinary Treatment

Defendants argue that DePiano fails to establish that the disciplinary actions against him were based on his cross-dressing.  DePiano argues that his penalties were excessive when compared to the penalties imposed on other corrections officers who worked on the same shift, for similar infractions.  Because DePiano cannot demonstrate Defendants' proffered reasons for his demotion are pretextual, the Court will grant summary judgment on this claim.

Where a plaintiff, as here, is unable to present direct evidence of unlawful discrimination motivating the alleged disparate treatment by the employer, courts apply the familiar McDonnell Douglas/Burdine burden-shifting framework.  Monaco v. American General Assurance Co., 359 F.3d 296, 301 (3d Cir. 2004); Sisler, 723 A.2d at 954-55.  That framework applies in cases under the LAD just as it applies in Title VII and

ADEA cases.  See id. at 301 (citing Sisler, 723 A.2d at 955).

The McDonnell Douglas/Burdine analysis, which proceeds in three stages, establishes the allocation and ordering for the burdens of production and proof in discrimination cases.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 142 (2000) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 506 (1993)).  First, a plaintiff must establish a prima facie case of discrimination.  Reeves, 530 U.S. at 142; Sisler, 732 A.2d at 955.  A rebuttable presumption of unlawful discrimination arises if a plaintiff establishes this prima facie case.  Sisler, 732 A.2d at 955 (citing Burdine, 450 U.S. at 253).  Next, to rebut this presumption of unlawful discrimination, the employer must present admissible evidence of a legitimate, nondiscriminatory reason for its employment action.  Reeves, 503 U.S. at 142;  Sisler, 732 A.2d at 955 (citing Burdine, 450 U.S. at 254).

Finally, if the defendant produces evidence of a legitimate non-discriminatory reason for its action, then the presumption vanishes.  Sisler, 732 A.2d at 955 (citing St Mary's Honor Ctr., 509 U.S. at 507-08).  At that point the plaintiff must prove, by a preponderance of the evidence, that the legitimate reason offered by the defendant was not its true reason, but was actually a pretext for discrimination.  Sisler, 732 A.2d at 955; see also Burdine, 450 U.S. at 252-53.  This can be done directly by demonstrating that a different, identifiable reason more likely motivated the employer, or indirectly by demonstrating that the reason articulated by the employer is not credible.

20

Reeves, 530 U.S. at 143; Sisler, 732 A.2d at 955.  Despite the intermediate shifting of evidentiary burdens within this framework, the ultimate burden of persuading the fact finder that the defendant engaged in unlawful discrimination remains with the plaintiff. Id. at 955; Reeves, 530 U.S. at 143; Burdine, 450 U.S. at 253.

Inasmuch as the only challenge to DePiano's ability to set forth a prima facie case of discrimination was based on Defendants' contention that DePiano was not perceived as a homosexual–an argument this Court has rejected–the Court will proceed to the second and third steps of the McDonnell Douglas procedure.

For a claim of discrimination based on disparate disciplinary action, courts must compare the discipline levied against the plaintiff to that against similarly situated employees outside of the plaintiff's protected class.[5]  See Jason v. Showboat Hotel & Casino, 747 A.2d 802,   There is no rigid formula for comparing similarly situated employees, but the New Jersey Supreme Court and the Third Circuit have set forth the general parameters.  A plaintiff is similarly situated with another employee if he and the employee have the same qualifications and are working in the same job category.  Peper

---

[5] This raises an issue not briefed by either party.  It is unclear what class of persons DePiano belongs to.  It seems this can be articulated many ways.  It may be that he is in the broad class of persons who do not conform to classic gender stereotypes.  Or he may be a part of a smaller class of male cross-dressers; or even an intermediate-sized class of male and female cross-dressers.  Because DePiano seeks to compare himself to both male and female employees who, the Court presumes, dress in conformity with gender stereotypes, and because Defendants have not posed any challenge to the employees to whom DePiano wishes to be compared, the Court will simply compare DePiano to the employees who are otherwise appropriate comparators.

v. Princeton Univ. Bd. of Trustees, 389 A.2d 465, 480 (N.J. 1978).  Experience and the

quality of work performed are relevant considerations in regards to qualifications.  Id.

Same job category means that the plaintiff must have been in the same "promotional

stream," with similar responsibilities.  Id.  But as the Peper court cautioned, there can be

no exhaustive list:  "The trial judge will have to make a sensitive appraisal in each case to

determine the most relevant criteria."  Id.  Along that line of reasoning, the Third Circuit

has explained that the proper focus is on the employer's stated criteron or reason for

taking its employee action.  In other words, the Court must take the employer's stated

reason for making its employment decision and then apply that stated reason to the

supposedly similarly situated employee who was treated favorably.  See Simpson v. Kay

Jewelers, Div. of Sterling, Inc., 142 F.3d 639, 647 (3d Cir. 1998) ("In determining

whether similarly situated nonmembers of a protected class were treated more favorably

than a member of the protected class, the focus is on the particular criteria or

qualifications identified by the employer as the reason for the adverse action.").

       In an attempt to demonstrate that Defendants' stated reasons are pretextual,

DePiano seeks to compare his disciplinary record with the disciplinary records of Captain

Bernard Phillips, Captain Kimberly Gregg, Lieutenant Geraldine Cohen, Lieutenant

Michael Lopez, Sergeant Brian McNew, Officer Dominic Bucca, and Officer Donald

Conner.

       According to Defendants, DePiano was demoted from his position as a

sergeant "for infractions of rules and regulations."  Defendants cite specifically to the three separate disciplinary matters that ultimately led to his demotion.  In the first incident, DePiano's failure to follow the proper procedures caused an inmate to spend three extra days in a disciplinary cell.  In the second incident, DePiano did not provide the proper paperwork to the authorities who were taking custody of an inmate.  For that reason, those authorities had no idea that the inmate was not eligible to post bail.  The inmate posted bail and was released.  In the final incident, DePiano questioned an inmate when that inmate's paperwork indicated–through an "X" in the "No" box in response to the question whether the inmate would waive his Miranda–that he was invoking his constitutional right to remain silent.  For the first two disciplinary charges, Merline recommended six and ten day suspensions, respectively.  For the final charge, Merline requested DePiano be terminated.  A hearing regarding all three charges was held on November 15, 2002 before hearing officer James Walsh.  After a disagreement regarding the conduct of the hearing, DePiano, who was accompanied by counsel, left and chose not to participate.[6]  Walsh concluded that the modified recommendation of demotion from the

---

[6] In his brief, DePiano challenges the accuracy of the charge against him for the final incident.  He argues that Defendants cannot establish who actually checked the "No" box on the Miranda form.  The time to challenge the accuracy of that charge was during the disciplinary hearing.  This Court is not a forum for litigating the accuracy or logic behind employment decisions.  See Billet v. CIGNA Corp., 940 F.2d 812, 825 (3d Cir. 1991) ("[Plaintiff's] view of his performance is not at issue; what matters is the perception of the decision maker.") overruled in part on other grounds by St. Mary's Honor Ctr. 509 U.S. 502; see also Swider v. Ha-Lo Industries, Inc., 134 F. Supp. 2d 607, 628 (D.N.J. 2001) ("[T]he question . . . is not whether the employer's decision was wrong or mistaken, but rather whether the proffered reason was not the real reason motivating the employer's action.").

rank of sergeant to the rank of corrections officer was warranted based on DePiano's

having admitted to the charges against him as well as DePiano's prior disciplinary history.

Thus, Defendants have articulated a legitimate reason for DePiano's

demotion.  The next step is to test that reason against the disciplinary action taken against

similarly situated employees for similar infractions.

Of all the officers to whom DePiano has attempted to compare himself,

Sergeant Brian McNew appears to be the only appropriate comparator.[7]  Both McNew

---

[7]  Geraldine Cohen is not appropriate for comparison for at least two reasons.  First, Cohen has received only a handful of disciplinary charges.  Though one of the charges against her was for releasing inmates a day early, that was her only charge for such conduct while Merline was warden, and only the third charge in her career.  A second reason Cohen and DePiano are improper comparators is that they were not in the same job category when they committed their respective infractions; DePiano was a sergeant and Cohen was a Lieutenant. Thus, they were not similarly situated.

Donald Conner is not an appropriate comparator because the records before the Court do not reveal any failure to follow the procedures for releasing inmates while Merline was warden. Further, there is no record of Conner attempting to force an inmate to speak after the inmate had invoked his constitutional rights.  Connor was, however, demoted to the rank of corrections officer–though the details surrounding that demotion are unclear.  In a similar vein, neither Michael Lopez nor Dominick Bucca have a record of improperly releasing an inmate or disregarding constitutional rights.  And though Bernard Phillips has a record of two improper releases, neither release occurred while Merline was Warden.  Also, Phillips was a Lieutenant who worked in the "bootcamp" area.  Finally, Kimberly Gregg does not have a record of improper releases or improper interrogation.

DePiano has attempted to compare himself to the forregoing employees by arguing that they have all committed infractions just as serious if not more serious than those he has committed.  But if the employees have not committed similar infractions, there is no way to compare their punishments.  For instance, no intelligent conclusion can be drawn by comparing the punishment Dominick Bucca received for his DWI offense–forty-five days held in abeyance–with DePiano's demotion for keeping a prisoner in detention for three days longer than was warranted, making omissions that led to an inmate's wrongful release, and infringing one's right not to speak.  Thus, the Court can compare only those employees who held a similar position and committed similar, not necessarily identical, infractions.

and DePiano were sergeants, both had a lengthy–in terms of numbers–disciplinary history, and both were cited for the improper release of inmates.  In comparing the two it can be concluded that McNew received treatment favorable to that afforded DePiano.  From May of 2000 through February of 2001, McNew received eight disciplinary charges for the improper release of inmates.  That is, he failed to follow the proper procedures for releasing an inmate.  It does not appear that McNew committed any errors that led to the release of an inmate who should not have been released.  Rather, as a general matter, McNew seems to have consistently failed to perform the appropriate steps for releasing inmates.  Usually, McNew's misconduct involved his failing to note the release of inmates in a victim notification database.  Specifically, in May of 2000 McNew received a two-day suspension for the improper release of several female inmates.  In July of 2000 there were two instances of improper releases, one of which involved five inmates.  McNew received the discipline of "counseling" for both incidents.  In September of 2000, McNew again recevied discipline for improper releases; this time for the improper release of three inmates and then five inmates.  McNew received a reprimand and then a warning.  In October of 2000, McNew received a reprimand for the improper release of an inmate.  He received yet another reprimand for the improper release of three inmates in November.  Finally, in February of 2001, McNew received a warning for the improper release of two inmates.

　　　　Under the LAD, however, this is not enough to establish a claim for

discrimination.  As the appellate division in <u>Jason</u> explained, "[a]n inference of discrimination does not arise 'anytime a single member of the protected group was allegedly treated more favorably than one member of the protected group, regardless of how many other members of the non-protected group were treated equally or less favorably." <u>Jason</u>, 747 A.2d at 808 (quoting <u>Simpson</u>, 142 F.3d at 646).  Because DePiano has not offered any other appropriate comparators, he has not established that Defendants' stated reasons is pretextual.  The Court will, therefore, grant Defendants' motion on this part of DePiano's claim.

### C.  <u>Section 1983 Claims for Invasion of Privacy</u>

DePiano claims that his right to privacy was violated when Merline showed other employees pictures in which DePiano was dressed in women's clothing.  He is specifically alleging that this was an intrusion upon seclusion of his sexual activity, and that this constitutes a violation of his right to privacy under the Fourteenth Amendment. The Defendants' argue that the applicable statute of limitations has lapsed on DePiano's section 1983 claim.  Alternatively, they argue that if the court finds that the statute of limitations has not lapsed, the Defendants did not commit any violations that would give rise to a claim under section 1983.  The Court finds none of Defendants' arguments persuasive.

                             1.  *Constitutional Right to Privacy*

        DePiano claims Defendants violated his constitutionally protected right to privacy when they disseminated photographs of him dressed in women's clothing, in violation of 42 U.S.C. § 1983.  The Court recognizes this as a claim for violation of DePiano's right against disclosure of information he had a right to keep private.  To prevail on such a claim, a plaintiff must establish that the privacy right at issue is a fundamental one.  Doe v. Southeastern Penn. Transp. Authority (SEPTA), 72 F.3d 1133, 1137 (3d Cir. 1995).  Third Circuit jurisprudence "takes an encompassing view of information" that is protected from disclosure.  Sterling v. Borough of Minersville, 232 F.3d 190, 195 (3d Cir. 2000).  Such information, according to the Third Circuit, falls within a "zone of privacy" and is protected from disclosure by the state absent an overriding interest in its disclosure.  Id. at 196.  Specifically, information that falls within the zone of privacy may be disclosed by the state when it has a "'genuine, legitimate and compelling'" interest in disclosing the otherwise private information.  Id. (quoting Doe, 72 F.3d at 1141).  On the topic of disclosing one's sexuality, or even one's sexual proclivities, the Third Circuit has, for the most part, already declared the improbability that "the government would have a legitimate interest in disclosure of" such information.  Sterling, 232 F.3d at 196.[8]

---

      [8]  Footnote 4 of the Sterling opinion exemplifies the Third Circuit's self-described "encompassing view" of the type of information that is protected from disclosure:

      While we have not previously confronted whether forced disclosure

Having thus defined the contours of the claim DePiano must prove to prevail on his section 1983 claim, the Court cannot grant Defendants' motion for summary judgment.  In short, there is no question that Merline showed the photos to others and that he had no legitimate reason for doing so.  There is sufficient evidence from which one can infer that Defendants, especially Merline, disclosed either the photos or the details of the photos gratuitously to DePiano's co-workers and the inmates housed at the prison.   The deposition testimony of Merline himself makes it clear that he revealed the photos gratuitously: "Q.  Are you saying that any time that you showed anybody the photographs, that you were simply showing them for purposes of telling them that the photographs simply existed?  A.  Yes.  Q.  Was there any other reason that

---

of one's sexual orientation would be protected by the right to privacy, we agree with other courts concluding that such information is intrinsically private. See Powell v. Schriver, 175 F.3d 107, 111 (2d Cir.1999) ("the excrutiatingly private and intimate nature of transsexualism, for persons who wish to preserve privacy in the matter, is really beyond debate"); Bloch v. Ribar, 156 F.3d 673, 685 (6th Cir.1998) (publicly revealing information regarding sexuality and choices about sex exposes an aspect of our lives that we regard as personal and private); Eastwood v. Dept. of Corrections, 846 F.2d 627, 631 (10th Cir.1988) (right to privacy "is implicated when an individual is forced to disclose information regarding personal sexual matters"); Thorne v. City of El Segundo, 726 F.2d 459, 468 (9th Cir.1983) (the interest raised in the privacy of sexual activities is within the zone of privacy protected by the Constitution).

Sterling, 232 F.3d at 196 n.4.  As is plain from the text of the above-quoted footnote, the Third Circuit appears disinclined to limit one's right against disclosure to one's sexual orientation.  Rather, it appears the details of one's sexual life in general are protected from disclosure absent an overriding interest.  And as the court explained in its Sterling opinion, "the more intimate or personal the information, the more justified is the expectation that it will not be subject to public scrutiny."  Id. at 195.

28

you showed anybody else the photographs?  A.  Not that I recall."  (Merline Dep. at

62:18-25).  To be sure, even the people to whom Merline showed the pictures were not

sure of Merline's motives.  When asked why Merline showed him the pictures of

DePiano, Fred Frederiksen, Deputy Director of the Atlantic County Justice Facility,

explained that he did not know: "Q.  Do you know why he asked you about the–why did

he show you the photographs?  A.  I have no idea.  Q.  Well, didn't you say why are you

showing me this stuff?  A.  I didn't really ask him at the time why he was showing me."

(Frederiksen Dep. at 23:22-24:3).

       Drawing from the deposition testimonies of several of DePiano's

coworkers, one could infer that the pictures of DePiano or at least the details of the

pictures were the subject of haphazardly circulated rumor within the county jail.

As Frederiksen explained when asked for his reaction to seeing the pictures first-hand, "I

wasn't all that surprised because I had previously heard apparently for years prior that

there were photographs, but I had never asked or inquired about it or talked to anybody

about it."  (Frederiksen Dep. at 24:5).  Cohen, a coworker and confidant of DePiano,

deposed that, from her perspective, everyone who worked at the Atlantic County facility

knew about the pictures: "A.  Pretty much my impression was that everybody knew.  Q.

Knew that these photographs existed?  A.  Well everybody talked about them as if they

did, yes.  Now, how many people actually knew–you know what I'm saying–or anybody

that actually saw them, I couldn't swear."  (Cohen Dep. at 21:4-9).  In addition to

DePiano's coworkers knowing about the pictures, Cohen got the impression that members of the prison population also knew about the pictures.  Specifically, when a woman prisoner's clothing was missing, Cohen and her partner threatened the population with a lock down and full search if the clothing was not returned.  In response, a prisoner "yelled out, oh, why don't you look in DePiano's car, he must have it, because I have seen the pictures . . . ."  (Cohen Dep. at 15:19).

DePiano can thus establish that the pictures of him were disclosed by Defendants without a legitimate reason.  From the testimonies of Cohen and Frederiksen, it is apparent that the pictures of DePiano were not kept private at all; rather they, or their details, were facilely circulated throughout the ACJF.[9]  As for Merline's reasons for disclosing the pictures, the testimonies of Merline and Frederiksen demonstrate that there were no legitimate ones.  Finally, the intensely personal an intimate nature of the photos–DePiano dressed in women's clothing while either conscious or unconscious[10]–affords DePiano protection from disclosure of those photos.  There is no doubt that the Third Circuit jurisprudence on this topic extends to protect DePiano from

---

[9]  The Court rejects outright Defendants' argument that DePiano waived his right to privacy when he went to a Halloween party dressed as a woman.  It is ludicrous to suggest that showing up at a Halloween party dressed as a woman deprived DePiano of any right against the disclosure of private pictures of him partaking in his cross-dressing habit.

[10]  The Court does not see the difference, as far as DePiano's right to privacy is concerned, between his being conscious or unconscious, or whether he was committing the acts depicted in the photos of his own volition.  Certainly the parties have not articulated a reason in the law for making such a distinction.

30

the senseless and haphazzard dissemination of the photos of him in women's clothing.

_____2. *Statute of Limitations for the Section 1983 Claim*

The statute of limitations for a section 1983 claim is determined by the limitations period for personal injury claims in the state of the alleged wrongdoing.  In New Jersey, the statute of limitations for personal injury claims, in general, is two years, see N.J. Stat. Ann. § 2A:14-2;  Simone v. Narducci, 262 F.Supp. 2d 381, 387 (D.N.J. 2003), and the limitations period for the specific claim of intrusion upon seclusion is two years as well.  Rumbauskas v. Cantor, 649 A.2d 853, 856-58 (N.J. 1994).  The statute of limitations period typically begins to run when a cause of action accrues, or from the moment of the wrong.  However, New Jersey allows for tolling of the time of accrual by applying the discovery rule–an equitable rule that seeks to "avoid harsh results that otherwise would flow from mechanical application of the statute of limitations." Vispisiano v. Ashland Chemical Co., 527 A.2d 66, 71 (N.J. 1987); see also Lopez v. Swyer, 300 A.2d 563, 566 (N.J. 1973).  Under the discovery rule, an injured party's cause of action will not accrue "until [he] discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim," and that his injury is the fault of another.  Lopez, 300 A.2d at 565; see also New West Urban Renewal Co. v. Viacom, Inc., 230 F. Supp. 2d 568, 572 (D.N.J. 2002).

Federal courts, in determining whether to apply the discovery rule, must

31

approach the issue as they would any other issue on summary judgment.  That is, a court cannot grant summary judgment to a defendant on limitations grounds unless there is no genuine issue of material fact regarding the expiration of the limitations period.  See Goodman v. Mead Johnson & Co., 534 F.2d 566, 573 (3d Cir. 1976).

Whether the discovery rule applies to enlarge the window in which DePiano needed to file his claim will be a question for trial.  There is no doubt that the moment of injury in this case is the moment that Merline began showing the photographs to other officers.  The Defendants argue that DePiano should have discovered that he had been wronged between 1992 and 1996, when other officers taunted DePiano about being a cross-dresser.  Though DePiano admits to being taunted in this way, he denies that he was aware that the photographs existed before September 2002.  He further denies that he could attribute the taunts to Merline's displaying the photographs.  Given the testimonies of Cohen and Frederiksen, one can find DePiano's claim–that he did not know the photographs existed–to be not credible.[11]  Conversely, one may not find it inconsistent that DePiano was taunted about being a cross-dresser but nonetheless did not know about Merline disclosing the pictures to several of DePiano's coworkers.  The question will be whether at some point earlier than two years before DePiano filed this lawsuit he knew, or with reasonable diligence should have known, that Merline was disclosing the photos to others.  Because one can reasonably reach varied conclusions on this controlling question,

---

[11]  Defendants' entire argument on the discovery rule focuses on this credibility problem–a problem the Court cannot resolve on summary judgment.

32

the Court will deny summary judgment.


          D.  <u>Exhaustion of Remedies</u>

          Finally, Defendants argue that because DePiano failed to make use of

Atlantic County's administrative remedies available to him for claims of discrimination,

his claims should be barred.

          Exhaustion of state administrative remedies is not necessary in order to

bring a claim under section 1983 or the LAD.  For those who are not prisoners,[12]

exhaustion of state administrative remedies is not a prerequisite to bringing a claim under

section 1983.  Patsy v. Bd. of Regents of State of Florida, 457 U.S. 496, 516 (1982); U. S.

ex rel. Ricketts v. Lightcap, 567 F.2d 1226, 1229 (3d Cir. 1977).  Analogously, the LAD

gives plaintiffs a choice of forum for claims of discrimination.  Garfinkel v. Morristown

Obstetrics & Gynecology Assoc., P.A., 773 A.2d 665, 669 (N.J. 2001). Plaintiffs may

choose to either make use of administrative remedies or bring suit in court.  Garfinkel,

773 A.2d at 669.

          DePiano was not required to make use of Atlantic County's available

remedies before bringing his claims.  Therefore, Defendants are not entitled to summary

judgment on this basis.

---

[12]  The Prison Lititgation Reform Act, codified at 42 U.S.C. § 1997e(a), requires
exhaustion of available remedies before bringing any claim complaining of prison conditions.
See Spruill v. Gillis, 372 F.3d 218, 227-28 (3d Cir. 2004)  This, of course, does not apply to
DePiano.

**IV. CONCLUSION**

For the reasons expressed in the body of this Opinion, the Court will grant

Defendants' motion with respect to DePiano's claims of disability discrimination and

disparate treatment based on gender, but will deny Defendants' motion in all other

respects.  An Order will follow.


s/ Robert B. Kugler
Dated: 9/2/05    ROBERT B. KUGLER
United States District Judge

34