## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY
## CAMDEN VICINAGE

|  |  |  |
|---|---|---|
| GREGORY DEPIANO, | : | |
| | : | |
| Plaintiff, | : | Civil No. 02-5441 (RBK) |
| | : | |
| v. | : | **OPINION & FINDINGS** |
| | : | |
| ATLANTIC COUNTY, et al., | : | |
| | : | |
| Defendant(s). | : | |
| | : | |

**KUGLER**, United States District Judge:

Plaintiff Gregory DePiano brings this action against his employer, the County of Atlantic, and Gary Merline, Warden of the Atlantic County Justice Facility, alleging a violation of his constitutional and statutory rights. He seeks reinstatement to his former position of Sergeant in the county corrections department. Specifically, he claims the county harassed and disciplined him in violation of the New Jersey Law Against Discrimination, N.J. Stat. Ann. § 10:5-1, et seq. ("NJLAD"), because high level employees of the county perceived him to be a cross-dresser. Furthermore, plaintiff claims defendants violated his constitutional right of privacy, enforceable through 42 U.S.C. § 1983, by disclosing and permitting disclosure of photographs showing him dressed in female attire.

The Court previously granted defendants judgment on all of plaintiff's claims except the harassment claim under the NJLAD and the invasion of privacy claim pursuant to §1983. In an Order and Opinion dated December 3, 2004, this Court granted defendants summary judgment

on all of plaintiff's claims on grounds of judicial estoppel based upon plaintiff's failure to disclose this civil action in his bankruptcy proceedings.  After plaintiff filed a motion for reconsideration, the Court restored plaintiff's equitable claims for reinstatement under the NJLAD and § 1983. (See Opinion & Order dated January 31, 2005, D.E. Nos. 40, 41.) Thereafter, in an Order and Opinion dated September 2, 2005, the Court granted defendants summary judgment on plaintiff's NJLAD claims for disability discrimination and disparate treatment based on gender.  Therefore, the only remaining claims currently before the Court are plaintiff's harassment claim under the NJLAD and the invasion of privacy claim brought pursuant to § 1983.

 Because the remaining relief sought is strictly equitable, the Court conducted a bench trial over 13 days, ending March 3, 2006.  Counsel were thereafter directed to file proposed findings of fact and conclusions of law, together with a reply if so desired.  Defendants filed their proposed findings on March 31, 2006, and Plaintiff filed his proposed findings (entitled "Plaintiff's Closing Argument:  Proposed Findings of Fact and Law") on April 1, 2006. Defendants filed a "Rebuttal" on April 7, 2006, and plaintiff did the same on April 14, 2006.

Having heard the testimony of the witnesses and having considered the arguments of counsel together with the papers filed, and giving due regard for the credibility of witnesses, the following constitutes the Court's findings and judgment pursuant to Federal Rule of Civil Procedure 52(a).

## I.  FACTS

1.  Plaintiff Gregory DePiano began work as a corrections officer for Atlantic County on

August 31, 1987.  1T 158-2.[1]  Sometime in 1997 he was promoted to Sergeant.  On November 15, 2002, as a result of a departmental hearing, the hearing officer (James D. Walsh) recommended a 6 day suspension, a 10 day suspension, and a demotion from Sergeant to Corrections Officer.  The county adopted that decision and plaintiff was demoted in January 2003.[2]  P1.

    2.  As of February 25, 2002, DePiano had accumulated forty seven (47) disciplinary actions in the 14 ½ years he had been employed at the Atlantic County Justice Facility ("ACJF").  D6-D9.  These include 16 suspensions for a total of 53 days, 14 written reprimands, and 12 counselings.  D9.  The disciplinary actions occurred over the tenure of four different wardens: Fiscor - 2; Markward - 5; Mazzone - 17; Merline - 23.  D6.  Plaintiff's disciplinary history places him in the bottom 7th percentile of all corrections officers.  That is, 93% of all county corrections officers have better disciplinary records.  3T 14:21-15:7.  Though he had the right to do so,

---

[1]The court will refer to transcripts by numbering as follows:

    1T:  2/09/06
    2T:  2/10/06
    3T:  2/14/06
    4T:  2/16/06
    5T:  2/17/06
    6T:  2/21/06
    7T:  2/22/06
    8T:  2/23/06
    9T:  2/27/06
   10T:  2/28/06
   11T:  3/01/06
   12T:  3/02/06
   13T:  3/03/06

Thereafter will appear the page number and line number separated by a colon.  Exhibits in evidence will be referred to as P_ or D_.

[2]Plaintiff has appealed to the New Jersey Merit System Board, which will conduct a hearing in August 2006, before a N.J. Administrative Law Judge.  P1.

plaintiff never filed any grievance relating to the disciplinary actions.  Likewise, before the

litigation, he never claimed he was harassed or discriminated against.  3T 43:6-45:6.  The ACJF

employs a progressive discipline approach.  As an employee commits more (and more serious)

infractions, the punishment increases up to dismissal.  2T 29:12-31:l; 4T 187:10-189:10.

3.  Gary Merline has been the Warden (or Director) of the ACJF since January 2000.  1T

50:3.  Previously, he served as a Corrections Officer and Sergeant.  1T 50:4-51:2.  In his capacity

as Warden, Merline implements policies and procedures for the ACJF which include discipline

and the daily operation of the facility.  1T 51:3-13.  There are three levels of authority above him

- department head, county executive and county freeholders.  1T 51:14-52:2.

4.  William E. Nugent was Atlantic County Counsel from April, 2000 until January 2003.

12T 51:20-52:3.  He became involved in certain disciplinary charges against DePiano.

5.  Dennis Levinson was elected in 2004 to a second four year term as Atlantic County

Executive.  12T 66:10-18.  As such, he had the authority to make a final determination in

personnel matters involving employees in the county corrections department.  12T 74:12-75.2.

He broke the "chain of command" and "interceded" in DePiano's disciplinary matters.  12T

67:22-72:2.

6.  There exists two color photographs of plaintiff dressed in female clothing.  D33:D34.[3]

In D33, he is lying on what appears to be a bed wearing a black hat.  His black shirt or blouse is

open, and what appears to be a red bra or tube top covers a portion of his chest.  He is wearing

earrings and red lipstick.  Handcuffs are also visible on the bed, to his left by his elbow.  Beyond

the handcuffs are pillows and stuffed animals.  DePiano is looking in the direction of the camera.

---

[3]Because these photographs were introduced into evidence during trial, they are
part of the record in the case and may be viewed by anyone.

In D34, he is apparently standing and wearing the same hat, blouse, earrings and lipstick.  The bra or tube top is not visible.  He is looking in the direction of the camera.

7.  The origin of these photographs is hotly contested.  Lisa Hurley-Madera testified that these two photos were among many pictures she took.  She claims that the photos were confiscated by corrections officers on one of the many occasions she was jailed at the ACJF.  None of her testimony is credible.[4]  The court need not determine who took the photos and when.

8.  In March of 1994, Frank W. Markward was Warden of the ACJF.  6T 5:18.  He received from Officer Wiggerman, his assistant, an envelope with no return address containing the two photos of DePiano. 6T 6:7-16.  He gave the photos to Merline, who at that time was a Sergeant in charge of Internal Affairs (IA).  6T 6:17.  Markward wanted them kept in a file in case something ever came up at a later date.  6T 7:2.  Markward also wanted them kept confidential.  6T 22:20-23:4.

9.  Merline contemporaneously wrote a report, D21, and placed it in DePiano's IA file.  1T 54:15.  He placed the photos in a white envelope bearing a return address of Atlantic County Department of Public Safety, 5060 Atlantic Ave., Mays Landing, NJ 08330, with the seal of Atlantic County.  He stamped the envelope front and back with the word "CONFIDENTIAL" in red block letters, P3-8, and placed the envelope in the back of DePiano's IA folder, sealed with tape.  2T 40:3-54:13.

10. These photos were maintained in the DePiano IA file in the locked IA room until they were given to Nugent in September or October of 2002, when the defendants learned of this

_____

[4]Plaintiff relies heavily on Lisa Hurley-Madera's testimony.  However, she also testified plaintiff was aware, from comments by inmates and other officers as early as 1992, of the existence of these photos.  5T 125:20-130:18.  If she is to be believed, the court would have to conclude plaintiff's claim accrued for more than two years before filing suit.

litigation.  1T 55:17-56:10.  The only other time the photos left the IA office was when Merline

met with the department head, Mulvihill.  12T 81:1-23.  Every county corrections employee who

is a sworn law enforcement officer has an IA file.  1T 56:13-18.  Included in this file are such

things as psychological examinations, confidential medical information or intelligence

information.  1T 58:3-7.

 11.  Merline and others (including Captain Murray) considered these photographs as

intelligence information.  12T 93:22; 3T 48:14.  They believed these photos could be used to

compromise DePiano.  12T 4:4.  Other types of information maintained by IA because of its

intelligence value include information regarding (1) officers observed in high crime areas, (2)

domestic violence calls involving an officer where the officer is not arrested, (3) officers in

financial distress, (4) officers who have contacted other agencies' confidential informants, or (5)

photos showing an officer attending a wedding when he had called out sick.  12T 5:17-6:25,

93:1-13, 91:11-92:2.

 12.  These photos were never shown to DePiano because intelligence is never shared with

the subject, and because DePiano is looking at the camera in the photos, it was assumed he knew

he was being photographed.  2T 14:25-15:5; 12T 3:25-5:6.  Thirteen (13) other county employees

have seen these photos since 1994:  Stephen Murray (IA officer), Orlando Echevarria (IA

officer), Frank Markward (former Warden), Fred Frederickson (deputy director), Richard

Mulvihill (department head), Frank Mazzone (former Warden), William Nugent (county

counsel), Brian Fisher (training officer), Phil Rice (training officer), Brian Devenney (IA officer),

Pat Wiggerman (assistant to the Warden), Kirkland Marks (IA officer), and Dorothy MacQuinn

(IA officer).  2T l42:12-143:3; 3T 52:3-58:3; 11T 56:ll-20; 12T 87:9-88:4.  All were either IA

officers or on the executive staff.  All officers assigned to IA received extensive training,

including training on the issue of confidentiality.  3T 60:5-25.

13.  From 1994 to 2002, approximately 450-500 corrections officers worked at the ACJF. 3T 58:4-9; 12T 37:2-7.  There is no credible evidence that anyone else saw these photos. DePiano testified he was unaware of the photographs (despite obviously looking at the camera) until Rice told him about them in September of 2002.  10T 65:20-67-2.  He also testified that inmates who allegedly tormented him over the years never mentioned anything about photos. 10T 63:5-65:11.

14.  While a sergeant in 1999-2001, DePiano placed bets with a bookie, and consequently, got caught up in a gambling investigation by the county prosecutor.  As a result, Merline prepared disciplinary charges against DePiano seeking a demotion.  3T 5:8-13:13. DePiano sought and received the intercession of Levinson, who asked Nugent to look into the matter.  12T 52:7-54:15; 12T 56:1-4.  Nugent ultimately worked out a lenient deal for DePiano which resulted only in a 5 day suspension.  Levinson went along with the 5 day suspension.  12T 68:15-69-25.  Merline played no role in the settlement of the matter or the imposition of this suspension and was disappointed in the result.  3T 15:21-6:11; 3T 18:11-19.  Neither Nugent nor Levinson were aware of the photos when they decided on this discipline. 12T 62:10; 12T 72:8.

15.  Thirty five days after the settlement of the gambling matter, DePiano improperly placed inmate Sandoz into a restricted housing unit called disciplinary cell detention.  2T 64:11-66:5; 3T 21-12.  Merline prepared disciplinary charges against DePiano seeking a six day suspension.  2T 64:11-65:4; D10.  In his official reports on the matter submitted to the county, DePiano admitted being responsible for this error.  2T 125:5-126:4 2T 81:1-3; D11.  During trial, DePiano only admitted he misread the paperwork and mistakenly took the word of Sandoz.  9T 216:20-221:10; 10T 20:9-21:16.  DePiano's trial testimony on this matter was not credible.

16.  DePiano was served with other disciplinary charges on January 29, 2002, which sought a ten (10) day suspension for the improper transfer of inmate Lynch to Camden County custody without forwarding a fugitive warrant.  3T 22:7-24:1; P31.  In his official report to the county and his deposition testimony, DePiano admitted the improper transfer.  3T 25:13; 10T 25:5-15; D13.  At trial, DePiano claimed he did nothing wrong in the Lynch transfer.  10T 21:21.  His trial testimony on this matter was not credible.

17.  On February 19, 2002, Merline served other disciplinary charges on DePiano, seeking dismissal of DePiano for his questioning of inmate Tomasini after the inmate invoked his Fifth Amendment right to remain silent during a criminal investigation being conducted by DePiano.  D14; 3T 29:4-31:7.  In a tape recorded statement to IA, DePiano admitted to improperly questioning Tomasini.  3T 31:8-16; D15.  He testified at his deposition he did not contest that he should be disciplined for this (and the Sandoz and Lynch matters).  10T 25:5-15.  However, at trial, DePiano denied any wrongdoing.  10T 24:1-9.  His trial testimony on this matter was not credible.

18. Though Merline prepared the paperwork for the Sandoz, Lynch and Tomasini disciplinary matters, he played no role in the final determination of DePiano's punishment.  2T 65:21-66:23; 2T 150:20-152:10; 2T 100:10-102:12; 2T 110:22-112:14; 3T 27:4-24.  Merline referred the reports to his department head, Mulvihill, who sent them on to Nugent.  2T 65:21-66:23; 12T 56:8-62:6.  It was Nugent, in consultation with Levinson, who decided what sanctions the county would seek in the Sandoz, Lynch and Tomasini matters as he had with the gambling charges.  12T 56:8-61:25.  Nugent even spoke with DePiano about the Sandoz, Lynch and Tomasini charges, and DePiano acknowledged responsibility for them and advised he would accept a demotion.  12T 60:7-61:21.  Merline played no role in the ultimate decision on

punishment in the Sandoz, Lynch and Tomasini matters.  12T 62:4-6.  Neither Nugent nor

Levinson were aware of the photos at the time Nugent made the decision on discipline.  12T

62:10; 12T 72:8.

19. Plaintiff Gregory DePiano was, on the whole, not a credible witness.  In addition to

his disavowal at trial of his statements and deposition testimony acknowledging responsibility for

the aforementioned disciplinary matters, there were numerous other inconsistencies in his

testimony.

## II.  CONCLUSIONS

### A.  Hostile Work Environment Harassment Claim under the NJLAD

The plaintiff failed to establish a valid "hostile work environment" harassment claim

under the NJLAD.  To state a hostile work environment claim, the plaintiff must show that the

complained-of conduct (1) would not have occurred but for the employee's protected status, and

(2) was severe or pervasive enough to make a (3) reasonable person believe that (4) the

conditions of employment have been altered and the working environment is hostile or abusive.

Lehmann v. Toys 'R' Us, Inc., 626 A.2d 445, 454 (N.J. 1993).  New Jersey recognizes hostile

work environment claims in the context of gender-stereotyping harassment.  Enriquez v. West

Jersey Health Sys., 777 A.2d 365, 373 (N.J. Super. Ct. App. Div. 2001); Zalewski v. Overlook

Hospital, 692 A.2d 131, 136 (N.J. Super. Ct. Law Div. 1996).

In the present case, plaintiff DePiano failed to establish the first prong of a hostile work

environment claim because he did not demonstrate by a preponderance of the evidence that the

discipline he received would not have occurred but for DePiano's cross-dressing.  First, whatever

animosity, if any, Gary Merline may have harbored towards plaintiff Gregory DePiano is

irrelevant, because Merline had no role in the imposition of the discipline at issue here.  Nugent

and Levinson made the discipline determination in the gambling, Sandoz, Lynch and Tomasini

matters.  As Nugent and Levinson had no knowledge of the photographs or any alleged cross-

dressing at the time the discipline decisions were made, plaintiff DePiano utterly failed to prove

that Merline's alleged perception of him as a cross-dresser played any role in the gambling,

Sandoz, Lynch or Tomasini matters.

Second, the defendants clearly demonstrated a legitimate basis for the discipline imposed

in the gambling, Sandoz, Lynch, and Tomasini incidents.  As far as the gambling is concerned,

there is no dispute that DePiano placed bets with an illegal bookie while he was a Sergeant.  In

the Sandoz incident, DePiano transferred an inmate to the wrong housing unit.  In the Lynch

incident, DePiano improperly transferred inmate Lynch to Camden County custody without

forwarding a fugitive warrant.  And, in the Tomasini incident, DePiano questioned an inmate

after that inmate had invoked his right to remain silent.  Furthermore, DePiano previously

admitted his wrongdoing and accepted responsibility for the Sandoz, Lynch, and Tomasini

incidents in his own written reports, recorded statements and/or deposition testimony on those

matters, despite his subsequent trial testimony to the contrary.  Therefore, regardless of any

perception of DePiano as a cross-dresser, the defendants had legitimate reasons to impose the

discipline DePiano received.  As a result, plaintiff DePiano failed to show that the discipline he

received, including his demotion, would not have occurred but for the defendants' alleged

perception of him as a cross-dresser.

Because the plaintiff failed to establish the first prong of a hostile work environment

claim under the NJLAD, the Court finds that plaintiff is not entitled to reinstatement under the

NJLAD.

### B.  Invasion of Privacy Claim Pursuant to § 1983

Plaintiff failed to prove a violation of his privacy rights.  To state an intrusion upon seclusion claim pursuant to § 1983, a plaintiff must establish that the privacy right at issue is a fundamental one.  Doe v. Southeastern Penn. Transp. Authority (SEPTA), 72 F.3d 1133, 1137 (3d Cir. 1995).  The Third Circuit  "takes an encompassing view of information" that is protected from disclosure and seems inclined to consider personal sexual matters as "intrinsically private." Sterling v. Borough of Minersville, 232 F.3d 190, 195, 196 n.4 (3d Cir. 2000).  Such information falls within a "zone of privacy" and is protected from disclosure by the state absent an overriding interest in its disclosure. Id. at 196.  In particular, information that falls within the zone of privacy may be disclosed by the state when it has a "'genuine, legitimate and compelling'" interest in disclosing the otherwise private information.  Id. (quoting Doe, 72 F.3d at 1141).

As a preliminary matter, the Court finds that the defendants cannot prevail on their statute of limitations argument regarding plaintiff's invasion of privacy claim.  The defendants argue that New Jersey's two year statute of limitations on personal injury actions should bar the plaintiff's § 1983 claim for invasion of privacy because plaintiff allegedly knew of the cross-dressing photographs as early as 1991 and no later than 1996.  However, at trial, there was no clear evidence demonstrating that DePiano knew, or should have known, of the existence of the photos in his IA file more than two years prior to initiating this lawsuit.  Consequently, the discovery rule applies and the statute of limitations does not bar plaintiff's § 1983 claim. See Lopez v. Swyer, 300 A.2d 563, 565 (N.J. 1973) (explaining that, in New Jersey, the discovery rule provides that a cause of action does not accrue until the "injured party discovers, or by an exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim").

With respect to the merits of plaintiff's invasion of privacy claim, the Court notes that there was no widespread disclosure of the photographs in plaintiff's IA file depicting DePiano dressed in women's attire. See Flaskamp v. Dearborn Public Schools, 385 F.3d 935, 946 (6th Cir. 2004) (finding that any intrusion into the plaintiff's informational privacy was relatively minor because the "disclosure itself was quite limited"); In re Zuniga, 714 F.2d 632, 642 (6th Cir. 1983) (rejecting privacy claim based upon disclosure to grand jury because the "information will be disclosed only to the minimal extent necessary to promote a proper governmental interest and will not be subject to widespread dissemination").  From the time the photos entered the IA file in March 1994 until the time they were removed for this lawsuit in October 2002, only 13 out of roughly 450-500 corrections officers at the ACJF ever saw the photos.  The only people who saw the photos were executive staff or individuals who worked in the IA office and received training on issues of confidentiality.

Moreover, the county had, and has, a legitimate law enforcement-related reason to keep the photos in the manner they have been kept, which outweighs plaintiff's expectation of privacy in this case.  Prison officials have an obvious interest in the security of their institutions. Canedy v. Boardman, 16 F.3d 183, 186 (7th Cir. 1994); see Fraise v. Terhune, 283 F.3d 506, 516 (3d Cir. 2002) (noting that it is "beyond dispute that New Jersey has a legitimate penological interest in maintaining order and security in the prison system").  Accordingly, although correctional officers retain certain expectations of privacy, "it is clear that, based upon their place of employment, their subjective expectations of privacy are diminished while they are within the confines of the prison." McDonnell v. Hunter, 809 F.2d 1302, 1306 (8th Cir. 1987) (citing Security & Law Enforcement Employees, District Council 82 v. Carey, 737 F.2d 187, 202 (2d Cir. 1984)).  Courts have accepted this diminished expectation of privacy as reasonable "in light

of the difficult burdens of maintaining safety, order and security that our society imposes on those who staff our prisons." Id. (quoting Carey, 737 F.2d at 202).

In the present case, the defendants maintained the photographs of DePiano in a confidential IA file as an intelligence measure that could ultimately aid the defendants in preventing a threat to the security of the ACJF. In general, the IA files contain personal information about ACJF officers that comes into the possession of the defendants. Some of this information may have the potential to compromise the officers in some way, such as information that could be used by inmates to extort an officer. The IA files are maintained, at least in part, so that if an issue or suspicion arises regarding an officer's behavior, the prison officials will be able to use the information in the IA file to conduct an investigation and prevent any threat to the integrity or security of the ACJF. Here, the two photographs of DePiano were kept in his IA file in case there was ever any attempt by an inmate, or otherwise, to extort DePiano because of his cross-dressing. The photos were maintained in a sealed, confidential envelope in a locked IA unit. There was no widespread distribution of the photos by the defendants, as only 13 individuals who worked as trained IA officers or executive staff ever saw the photos while they were stored at ACJF. Therefore, the Court finds that (1) the defendants had a legitimate interest in keeping the photos in DePiano's confidential IA file, which outweighed DePiano's diminished expectation of privacy at the ACJF; and (2) the manner in which they were kept was sufficiently tailored to serve that legitimate interest in maintaining the security and integrity of the ACJF.

For the foregoing reasons, the Court finds that plaintiff DePiano has not established that he is entitled to reinstatement based upon his harassment claim under the NJLAD or his invasion of privacy claim pursuant to § 1983.  As a result, the Court will enter judgment for the defendants on both claims.  The accompanying Order shall issue today.


Dated:   ___4-25-06_____                    s/ Robert B. Kugler_____
                                                               ROBERT B. KUGLER
                                                               United States District Judge